UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

JAMES T. EVANS,

                              Plaintiff,

            – against –

SSN FUNDING, L.P., EDWIN AVENT, HSE,
INC., and HSE, LLC,

                              Defendants.

**OPINION AND ORDER**

15 Civ. 5514 (ER)

Ramos, D.J.:

        James T. Evans ("Evans" or "Plaintiff") brings this action against SSN Funding, L.P.

("SSN Funding"), Edwin Avent ("Avent"), HSE, Inc. and HSE, LLC (together, "HSE")

(collectively, "Defendants").  Before the Court is SSN Funding's motion for summary judgment

pursuant to Federal Rule of Civil Procedure 56 to dismiss the claims against it on the grounds

that there is no subject matter jurisdiction, and that there is no contractual debt.

        For the following reasons, SSN Funding's motion is DENIED.

I.      **Background**

    A.  **Factual Background**[1]

        1.      **Parties**

        Evans is an attorney residing in New York City.  Def.'s 56.1 Stmt. ¶¶ 1-2; Pl.'s 56.1

Counterstmt. ¶ 31.  He is a member of Evans & McConnell, LLC ("E&M"), which is a limited

---

[1] The following facts are based on SSN Funding's Statement of Undisputed Facts Pursuant to Local Rule 56.1
("Def.'s 56.1 Stmt."), Doc. 64; Plaintiff's Response to Defendant SSN Funding's Statement of Undisputed Facts
Pursuant to Local Rule 56.1 ("Pl.'s 56.1 Counterstmt."), Doc. 68; the respective exhibits to SSN Funding L.P.'s
memorandum of law in support of its Motion for Summary Judgment ("Mem. Supp. Summ. J."), Doc. 63; the
Affidavit of Evans ("Evans Aff."), Doc. 69; and other previously filed submissions of which the Court may take
judicial notice.  *Teamsters Nat'l Freight Indus. Negotiating Comm. et al. v. Howard's Express, Inc. (In re Howard's*

liability company whose organization and activities are not further described by either party. Def.'s 56.1 Stmt. ¶ 3.

SSN Funding is an Arkansas limited partnership with its principal place of business in Arkansas, and is the successor-in-interest to SSN Media Group, Inc. ("SSN Media"). Def.'s 56.1 Stmt. ¶ 4; Pl.'s 56.1 Counterstmt. ¶ 32. It became effective on May 15, 2013 through a Limited Partnership Agreement ("LPA"), whose membership consisted of (1) S.O.S. Media Holdings, Inc. ("S.O.S."), which is the General Partner of SSN Funding, (2) the Trustees of the Arkansas Venture Capital Investment Trust, a public trust, and (3) a number of individual limited partners whose names and addresses are set out in Annex A to the LPA.[2] Mem. Supp. Summ. J. Ex. 5 ("LPA") at 1; *see also* Evans Aff. Ex. 3 ("Campbell Dep. Tr.") 104:12-105:5. SSN Funding also holds an indirect interest in the Soul of the South Network ("Soul of the South"), a regional broadcast television network that provides news, information, entertainment and culture from an African-American perspective to several television stations in the United States. Def.'s 56.1 Stmt. ¶ 5; Mem. Supp. Mot. Dismiss at 4; Opp. Mot. Dismiss at 1.

Avent, a citizen of the State of Maryland, was the Chairman and CEO of SSN Media, SSN Funding, S.O.S., and HSE at all relevant times. Pl.'s 56.1 Counterstmt. ¶ 34; LPA at 65. HSE, Inc. was a Maryland corporation with its principal place of business in Maryland. Pl.'s 56.1 Counterstmt. ¶ 35. HSE, LLC is the successor-in-interest to HSE, Inc., and is also a Maryland corporation with its principal place of business in Maryland. *Id.* Evans contends that Avent used the HSE entities as vehicles to commit his alleged misconduct. Compl. ¶¶ 18, 22,

---

*Express, Inc.),* 151 Fed.Appx. 46, 48 (2d Cir. 2005) (courts are empowered to take judicial notice of public filings, including a court's docket). The facts are undisputed unless otherwise noted.

[2] Neither party has provided the Court with Annex A.

63, 71-72.  Neither of the HSE entities are parties to any of the relevant agreements in the instant action.

### 2. Promissory Notes

Beginning in late 2011, Evans invested a total of $250,000 in Soul of the South through two promissory notes with SSN Media.  On December 12, 2011, Evans, in his individual capacity, and SSN Media Group, LLC ("SSN Media LLC"), yet another entity related to SSN Funding and SSN Media, executed a promissory note pursuant to which Evans lent SSN Media LLC $150,000 ("December Note").  Def.'s 56.1 Stmt. ¶ 6; Pl.'s 56.1 Counterstmt. ¶ 36.  On March 20, 2012, Evans, in his individual capacity, and SSN Media executed a second promissory note for $100,000 ("March Note").  Def.'s 56.1 Stmt. ¶ 7; Pl.'s 56.1 Counterstmt. ¶ 38.  The December Note was amended on March 21, 2012 to assign SSN Media LLC's rights to SSN Media.  Def.'s 56.1 Stmt. ¶ 8; Pl.'s 56.1 Counterstmt. ¶ 37.  Both the December and March Notes (together, the "Promissory Notes") bear interest at a rate of 10% per annum, and have a maturity date of December 30, 2013.  Mem. Supp. Summ. J. Ex. 1 ("December Note") ¶¶ 1-2, Ex. 2 ("March Note") ¶¶ 1-2.  Importantly to the instant motion, the Promissory Notes allowed Evans to elect to cancel the Notes within one year—by March 20, 2013 and March 21, 2013 respectively—and receive "in lieu thereof, such other securities and/or notes and/or agreements and/or instruments as shall be similar to other securities and/or notes and/or agreements and/or instruments which may be issued to any other lender [] or investor in the Borrower."  *See* December Note at 1; March Note at 1.  In other words, the Notes allowed that Evans could choose to convert the loans he made to SSN Media to equity in the company, but only if he exercised that right within one year.  The Promissory Notes also provided that they may not be

amended "except by an agreement in writing signed by the Borrower and the Lender."

December Note ¶ 8; March Note ¶ 8.

Evans alleges that before executing the March Note, he spoke to two representatives of the Soul of the South, Frank Mercado-Valdes ("Mercado-Valdes") and Chris Clark ("Clark"), who agreed that the $100,000 loan would be placed in an escrow account and would not be utilized for any purpose unless and until a total of $2 million was raised for the Soul of the South. Pl.'s 56.1 Counterstmt. ¶ 41. Clark further provided instructions to Evans for wiring the funds into a purported escrow account. *Id.* However, the March Note contains no provision requiring the funds to be held in escrow. Def.'s 56.1 Stmt. ¶ 10.

Evans claims that Mercado-Valdes and Clark approached him in or around June 2012 and asked if he would authorize the release of the $100,000 from escrow so that SSN Media could purchase an interest in SSN Media Gateway, LLC ("Gateway"). Pl.'s 56.1 Counterstmt. ¶ 45. He agreed to release the funds, but only for this purpose. *Id.* at ¶ 48. However, unbeknownst to Evans—who believed that he had wired the $100,000 into an escrow account—the funds were never placed into escrow. *Id.* at ¶¶ 41, 44; *see* Evans Aff. Ex. 4 ("Avent Dep. Tr.") 177:2-14. Instead, the funds were placed by Avent in an HSE operating account and comingled with the funds therein, from which Avent paid for day-to-day operations of SSN Media and allegedly secured for HSE—and not SSN Media—a $100,000 interest in Gateway. Pl.'s 56.1 Counterstmt. ¶¶ 42, 49; *see* Avent Dep. Tr. 54:24-55:19; 116:10-16; 125:4-126:3. Soul of the South never received an interest in Gateway. Pl.'s 56.1 Counterstmt. ¶ 50.

### 3. Subscription Agreements

In early 2013, Clark approached Evans with the possibility of converting the $250,000 of debt into an equity interest in SSN Funding. *Id.* at ¶ 83; Def.'s 56.1 Stmt. ¶ 11. Pursuant to this

planned transaction, in March 2013, Clark asked Evans to execute a subscription agreement

("March Subscription Agreement"), and noted that another individual would be forwarding to

Evans "a side letter that will require [Evans'] signature that applies and converts [SSN Media's]

loan obligation to Limited Partnership Interests in the [sic] SSN Funding." *See* Mem. Supp.

Summ. J. Ex. 4 at 1, 3, 5; *see* Evans Aff. Ex. 8 at 2.  Evans claims that he never received this side

letter.  Pl.'s 56.1 Counterstmt. ¶ 89.  The record is unclear as to whether this side letter was ever

drafted, and whether it was contemplated to have a purpose distinct from the March Subscription

Agreement.

On or around March 18, 2013, Evans signed the March Subscription Agreement with a

commitment of $250,000, described as convertible interests.  Def.'s 56.1 Stmt. ¶ 13; Mem. Supp.

Summ. J. Ex. 3 ("March Subscription Agreement") at 1.  The March Subscription Agreement

states that upon S.O.S.'s "acceptance of this application," Evans will become a "[l]imited

[p]artner [of SSN Funding] under the terms and conditions of the Partnership Agreement."

March Subscription Agreement ¶¶ 1-2.  Notably, at the time the March Subscription Agreement

was executed by Evans, SSN Funding had not yet been formed.  *See* LPA at 1.  Moreover, it

states that the commitment will be treated as equity for United States federal tax purposes.  *Id.* at

¶ 17(l).  It also contains an anti-reliance provision, which states the following:

> "[The subscriber(s)] confirm that our subscription for limited partnership interests
> . . . in, and our Commitment to, the Partnership is made solely on the basis of the
> information contained in a Disclosure Memorandum dated February 25[,] 2013,
> and other ancillary documents relating to the business of the Partnership provided
> by its authorized representatives during the course of meetings in person with the
> undersigned or its authorized representatives, the Partnership Agreement, any side
> letter we have entered into with the Partnership and the General Partner and this
> Subscription Agreement . . . and not in reliance on any other information,
> representations or warranties, whether oral or written, provided by any Person
> including for the avoidance of doubt[,] the General Partner or any Affiliate
> thereof or any officer, agent, director, member, partner or employee of any such
> Person."

*Id.* at ¶ 6.  It further contains a provision regarding forward looking statements:

> "[The subscriber(s)] hereby declare, represent and warrant that . . . any statements made on behalf of the Partnership that are not statements of historical fact, should be considered forward looking statements.  Such statements include, without limitation, those relating to the Partnership's future business prospects, business plans, revenues, expenditures, capital needs, and income.  [The subscriber(s)] recognize that such statements are estimates reflecting the best judgment of the Partnership and involve a number of risks and uncertainties that could cause actual results to differ materially from those suggested by any forward looking statements."

*Id.* at ¶ 17(o).

On March 18, 2013, Evans sent Clark the executed March Subscription Agreement as well as two other documents:  (1) the execution page of the LPA, signed by Evans on that date, in his individual capacity; and (2) a document titled "Acknowledgement" dated March 15, 2013. *See* Evans Aff. Ex. 8.  The Acknowledgement was drafted by Evans and addressed to SSN Funding, and states the following in provision (g):

> Upon the issuance to me of a Limited Partnership Interest in SSN Funding, L.P. corresponding to a $250,000 capital contribution and in consideration thereof, and **provided that SSN Funding[,] L.P. shall concurrently therewith issue a minimum of $4,500,000[] in Limited Partnership Interests**, I hereby waive and release [SSN Media], its predecessors in interest, and its off[ic]ers, directors and promoters, from any and all claims of any kind which I may have under common law, equity, or securities statutes arising from my investment of $250,000 for my [SSN Media] Interests, and furthermore relinquish title to and tender to [SSN Media] all of my [SSN Media] Interests.  I understand that [SSN Media] shall soon be dissolved in accordance with the applicable provisions of the Delaware General Corporation Law.

*Id.* at 4-5 (emphasis added).  Evans is the only signatory to the Acknowledgement.  *Id.* at 5. However, he contends that after he provided the three documents to Clark, he confirmed with Clark that the proposed conversion of his debt into equity in SSN Funding was predicated on the representation that SSN Funding would be raising $4.5 million in capital.  Evans Aff. ¶ 68. Evans provides no further details about this purported communication.  Moreover, on March 18,

2013, after he received the three executed documents, Clark wrote to Evans, "I'll notify you when we receive a full close. We are still awaiting financial verification from the other investors who are pledging promissory notes." Mem. Supp. Summ. J. Ex. 4 at 1; Pl.'s 56.1 Counterstmt. ¶ 90. Evans claims that he understood this email from Clark to mean that the documents he executed would not become final, and his loan would not be converted into equity, until SSN Funding met the $4.5 million capital raise threshold. Pl.'s 56.1 Counterstmt. ¶ 90; Evans Aff. ¶ 70.

Approximately six months later, on September 30, 2013, Evans signed a second subscription agreement, but this time, Evans executed the agreement on behalf of E&M as the prospective subscriber with a commitment of $350,000, not $250,000 ("September Subscription Agreement"). Def.'s 56.1 Stmt. ¶ 14; Pl.'s 56.1 Counterstmt. ¶ 92; Mem. Supp. Summ. J. Ex. 6 ("September Subscription Agreement") at 1, 9. The September Subscription Agreement states that it "encompasses Moneys already received and acknowledged by SSN Funding and creates no new obligations for [E&M]." September Subscription Agreement at 1. It otherwise contains the same provisions as the March Subscription Agreement, including those providing that S.O.S.'s acceptance of the application will cause E&M to become a limited partner of SSN Funding, the provision stating that the commitment will be treated as equity, the anti-reliance provision, and the provision regarding forward looking statements. *Id.* at ¶¶ 1-2, 6, 17(l), 17(o). While SSN Funding states that E&M and S.O.S. were parties to the September Subscription Agreement, Evans claims that S.O.S. never became a party to the September Subscription Agreement because neither S.O.S., SSN Funding, nor any other entity related to SSN Funding executed that agreement. *See* Def.'s 56.1 Stmt. ¶ 16; Pl.'s 56.1 Counterstmt. ¶ 16.

The record shows that $250,000 of the $350,000 commitment was the same $250,000 investment Evans made through the Promissory Notes, and that the remaining $100,000 was an investment made by another individual named Peter Moore. *See* Mem. Supp. Summ. J. Ex. 9 at 2-3, Ex. 13 at 1; Campbell Dep. Tr. 155:20-25. However, it is unclear from the record, and neither party makes an effort to explain, why the September Subscription Agreement was drafted with E&M as a subscriber after Evans had already executed the March Subscription Agreement on behalf of himself, especially since E&M was not a signatory to the Promissory Notes.

In an email exchange in which Clark asked Evans to execute the September Subscription Agreement on September 30, 2013, Clark wrote, "it[']s the same thing you already signed. This is just a new subscription agreement. I will take care of the rest of the information." Mem. Supp. Summ. J. Ex. 7 at 3. But this email communication does not further shed light on why a new subscription agreement was necessary. William Campbell ("Campbell") testified at his 30(b)(6) deposition on August 5, 2016 as a representative of SSN Funding that the September Subscription Agreement is "presumably the combination of [] two subscription agreements," but admitted that he was not sure why the subscriber was listed as E&M, not Evans, and had a commitment of $350,000 instead of $250,000. Campbell Dep. Tr. 86:7-87:8.

SSN Funding contends that Evans acted as a limited partner for approximately 2 years thereafter by, *inter alia*, requesting a K-1 form, receiving K-1 statements showing that E&M was a limited partner in SSN Funding, participating in a limited partner meeting on October 30, 2013, writing a letter in February of 2014 alleging that Avent misused his investment funds, receiving notice of a limited partner meeting scheduled for August 11, 2014, corresponding with Clark about the need for a financial monitor for SSN Funding, and writing a shareholder derivative demand letter to Avent on March 12, 2015 after he learned that Avent purchased the Gateway

interest.  Def.'s 56.1 Stmt. ¶¶ 22-29.  Evans disputes that he was treated as a limited partner,

stating that the October 30, 2013 meeting was not a "limited partner meeting," that SSN Funding

never responded to his shareholder derivative demand letter or acknowledged him as a

shareholder, that he was initially told by SSN Funding that he could not participate in tax credits

with the limited partners, and that the K-1 statement he eventually received addressed to E&M

was "nonsensical . . . [and that he had] serious doubts about the propriety of this financial

information."  Pl.'s 56.1 Counterstmt. ¶¶ 23, 29, 102-05.  Evans does not further explain why the

K-1 statement he received was "nonsensical" or why he had such doubts.

### B.  Procedural History

Plaintiff filed the instant Complaint on July 15, 2015.  Doc. 1.  He brought the following

causes of action:  (1) breach of contract on the December Note against SSN Funding; (2) breach

of contract on the March Note against SSN Funding; (3) breach of fiduciary duty against Avent;

(4) negligent misrepresentation against Avent; (5) fraud against all Defendants; (6) conversion

against Avent and HSE; and (7) an accounting against Avent and HSE.  *Id.* at 6-11.  Avent and

HSE answered the Complaint on September 14, 2015.  Doc. 18.  SSN Funding filed its answer

on November 23, 2015.  Doc. 23.

On February 22, 2016, SSN Funding filed a motion to dismiss pursuant to Rule 12(b)(1)

and a motion for judgment on the pleadings pursuant to Rules 12(c) and 12(h).  Doc. 36.  SSN

Funding argued that the Complaint should be dismissed for a lack of subject matter jurisdiction,

or alternatively, that SSN Funding should be granted judgment on the pleadings because there

are no payment obligations owed under the Promissory Notes as those debts were converted into

equity interest in SSN Funding.  *See id.*  The Court denied the motions without prejudice on June

17, 2016.  Doc. 47.  It noted that since the subject matter jurisdiction issue is intertwined with

one of the central merits issues, it would not conclusively resolve the issue on a limited evidentiary record before the close of discovery.  *Id.* at 3-4.

On February 28, 2017, SSN Funding filed the instant motion for summary judgment, renewing its arguments that because Plaintiff converted the Promissory Notes into equity interest in SSN Funding, there is no diversity of citizenship, and moreover, that there is no contractual debt to enforce.  Doc. 61.

## II.    Legal Standard

### A.  Subject Matter Jurisdiction

Generally, challenge to subject matter jurisdiction is brought under Federal Rule of Civil Procedure 12(b)(1).  *U.S. ex rel. Woods v. Empire Blue Cross & Blue Shield*, No. 99 Civ. 4968 (DC), 2002 WL 1905899, at *3 (S.D.N.Y. Aug. 19, 2002) (treating a motion for summary judgment pursuant to Rule 56 that challenges the court's subject matter jurisdiction as a 12(b)(1) motion); *see also U.S. ex rel. Phipps v. Comprehensive Cmty. Dev. Corp.*, 152 F. Supp. 2d 443, 448-49 (S.D.N.Y. 2001).  The party asserting subject matter jurisdiction has the burden of proof. *Sharkey v. Quarantillo*, 541 F.3d 75, 82 (2d Cir. 2008).

However, while the party invoking jurisdiction may have the ultimate burden, "[w]here jurisdiction is 'so intertwined with the merits that its resolution depends on the resolution of the merits,' the court should use the standard 'applicable to a motion for summary judgment' and dismiss *only where 'no triable issues of fact' exist*."  *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 467 (S.D.N.Y. 2001) (emphasis added) (quoting *London v. Polishook*, 189 F.3d 196, 198-99 (2d Cir. 1999)); *see also Porter v. United States*, No. 13 Civ. 7332 (NRB), 2015 WL 1004953, at *3 (S.D.N.Y. Mar. 3, 2015) ("In such a case, 'the defendant is forced to proceed under Rule 12(b)(6)…or Rule 56…—both of which place greater restrictions on the district court's

discretion,' and the court should dismiss claims *only if there are no triable issues of fact*.")
(emphasis added) (citations omitted); *First Capital Asset Mgmt., Inc. v. Brickellbush,* 218
F.Supp.2d 369, 378-79 (S.D.N.Y. 2002), *aff'd,* 385 F.3d 159 (2d Cir. 2004).

### B. Summary Judgment

Summary judgment is only appropriate where the "materials in the record, including
depositions, documents, electronically stored information, affidavits or declarations, stipulations
(including those made for purposes of the motion only), admissions, interrogatory answers, [and]
other materials" show "that there is no genuine dispute as to any material fact and the movant is
entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), 56(c)(1)(A). "An issue of fact is
'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving
party." *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011)
(citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). A fact is
"material" if it might affect the outcome of the litigation under the governing law. *Anderson v.
Liberty Lobby*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment is first responsible for demonstrating the
absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323
(1986); *see also Atl. Mut. Ins. Co. v. CSX Lines, L.L.C.*, 432 F.3d 428, 433 (2d Cir. 2005).
"When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient
for the movant to point to a lack of evidence to go to the trier of fact on an essential element of
the nonmovant's claim." *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009)
(citing *Celotex Corp.*, 477 U.S. at 322-23); *see also* Fed. R. Civ. P. 56(c)(1)(B). The burden then
shifts to the non-moving party to come forward with admissible evidence sufficient to support
each essential element of the claim, and "designate specific facts showing that there is a genuine

issue for trial." *Celotex Corp.*, 477 U.S. at 324 (internal quotation marks omitted); *see also Cordiano,* 575 F.3d at 204.

In deciding a motion for summary judgment, the Court must "'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'" *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)). However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or surmise. *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). A motion for summary judgment cannot be defeated on the basis of conclusory assertions, mere denials, or unsupported alternative explanations of facts. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008); *see also Senno,* 812 F. Supp. 2d at 467. "The nonmoving party cannot defeat summary judgment by 'simply showing that there is some metaphysical doubt as to the material facts,'" *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (internal modifications omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)), it "must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F. Supp. 2d at 467-68 (citing *Anderson*, 477 U.S. at 256-57).

"Summary judgment is properly granted when the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir. 2002) (quoting *Celotex Corp., 477 U.S. at 322)*. In that situation, there can be no genuine dispute as to any material fact, "since a complete failure of proof concerning an essential

element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 322-23.

## III. Discussion

### A. Subject Matter Jurisdiction

Evans invoked subject matter jurisdiction based on diversity of citizenship. Compl. ¶ 8. The Court has diversity jurisdiction if (1) "the matter in controversy exceeds the sum or value of $75,000," 28 U.S.C. § 1332(a), and (2) there is "'complete diversity,' *i.e.* all plaintiffs must be citizens of states diverse from those of all defendants," *Pennsylvania Pub. Sch. Employees' Ret. Sys. v. Morgan Stanley & Co.*, 772 F.3d 111, 118 (2d Cir.), *as amended* (Nov. 12, 2014). There is no dispute that the matter in controversy exceeds $75,000. However, SSN Funding contends that Evans shares citizenship with SSN Funding because when Evans converted the $250,000 debt into equity through the Subscription Agreements, he became a limited partner in SSN Funding, either in his individual capacity or as a member of E&M.

For purposes of diversity jurisdiction, both limited liability companies and limited partnerships take on the citizenship of each of their members. *See, e.g.*, *Carden v. Arkoma Assocs.*, 494 U.S. 185, 195-96 (1990); *Handelsman v. Bedford Vill. Assoc. Ltd. P'ship*, 213 F.3d 48, 51-52 (2d Cir. 2000); *Quantlab Fin., LLC, Quantlab Techs. Ltd. (BVI) v. Tower Research Capital, LLC*, 715 F. Supp. 2d 542, 546-47 (S.D.N.Y. 2010); *Straub Investments, Ltd. v. Tirakian*, No. 05 Civ. 3299, 2007 WL 295600, at *1 (E.D.N.Y. Jan. 29, 2007). Therefore, SSN Funding is correct that if either of the Subscription Agreements validly converted the loans, the Court would be deprived of diversity jurisdiction.[3]

This jurisdictional issue is intertwined with the factual issue of whether there is any

---

[3] It is undisputed that Evans is a member of E&M.

contractual debt to enforce.  If Evans' loan was converted into equity in SSN Funding, then SSN Funding would not owe any debt payments to Evans under the promissory notes.  Accordingly, SSN Funding has the burden to prove that there are no triable issues of fact regarding the validity of the purported conversions.

Evans argues that the contemplated conversion never occurred because:  (1) he failed to elect to convert the loans into an equity interest within the one-year time limit set forth in the Promissory Notes, (2) S.O.S. and/or SSN Funding never executed the Subscription Agreements, and (3) the parties did not sufficiently evince mutual assent to be bound by the Subscription Agreements.  In determining whether there is a material dispute as to any of those issues, the Court will analyze the March Subscription Agreement and the September Subscription Agreement separately.[4]  The two Subscription Agreements involve different subscribers, Evans and E&M; different commitment amounts, $250,000 and $350,000; and were executed on different dates, one clearly within the one year limitations period and one clearly outside of it. SSN Funding does not provide any arguments as to why the Court should treat these Subscription Agreements as one.

### 1.    March Subscription Agreement

#### a)    Timing of Election to Convert Debt to Equity

Both Promissory Notes provide that Evans may elect to cancel the Notes and receive securities in lieu thereof.  *See* December Note at 1; March Note at 1.  They also provide that Evans could only make such election by March 20, 2013 and March 21, 2013 respectively.  *Id.* It is undisputed that Evans signed the March Subscription Agreement on March 18, 2013.  *See* March Subscription Agreement at 9; Evans Aff. Ex. 8 at 2, 21.  SSN Funding argues that this

---

[4] Throughout SSN Funding's papers, it often improperly conflates the two Subscription Agreements, seeking to bolster any weakness in one with the other.

date is the only pertinent date since the Promissory Notes only require Evans to make an election to cancel the Notes within the one-year time limit, and Evans' signature is evidence of his election. Reply Supp. Summ. J. at 6-7. Evans does provide an alternative interpretation of the Promissory Notes or claim that the contracts are ambiguous. Instead, he argues that the March 18, 2013 election was invalid because SSN Funding was not formed until May 15, 2013. Opp. Summ. J. at 12; *see* LPA at 1, 65. Evans argues that, prior to that date, there was no partnership for him to join.

By their terms, the Promissory Notes are governed by New York law. December Note ¶ 11; March Note ¶ 11. "Under New York law, the initial interpretation of a contract is determined by the court as a matter of law. In construing the provisions of a contract, . . . 'unambiguous terms' are given their 'plain and ordinary meaning.'" *Century Sur. Co. v. Franchise Contractors, LLC*, No. 14 Civ. 277 (NRB), 2016 WL 1030134, at *4 (S.D.N.Y. Mar. 10, 2016) (citations omitted). Contracts should be "construed so as to give full meaning and effect to all of its provisions. [A]n interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless…is not preferred and will be avoided if possible." *LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.,* 424 F.3d 195, 206 (2d Cir. 2005) (internal quotation marks and citations omitted). The plain language of the Promissory Notes only applies the one-year limitation to Evans' offer to cancel the Notes. It does not impose the time limit on acceptance of Evans' offer. If the parties wished to impose a time limit on when the cancellation and replacement of the Notes were consummated, they could simply have required that the Notes be cancelled and replaced within a year, instead of requiring only that Evans can make his *election* to do so within a year.

Furthermore, under New York law, a contract that was entered into prior to a

corporation's formal organization will still be binding upon the corporation if it subsequently ratifies or adopts the pre-incorporation contract. *In re Robbins Int'l, Inc.*, 275 B.R. 456, 468 (S.D.N.Y. 2002), *aff'd,* 56 F. App'x 55 (2d Cir. 2003). Thus, the mere fact that a contract affecting the rights of a corporation was offered prior to the corporation's formal incorporation does not invalidate the offer. Accordingly, by signing the March Subscription Agreement on March 18, 2013, Evans offered to cancel the notes and receive in its place equity in SSN Funding, thereby making his election under the Promissory Notes timely. [5] The timeliness of Evans' offer to convert the debt via the March Subscription Agreement does not end the inquiry of whether the March Subscription Agreement is valid, however. SSN Funding concedes that it must also establish that S.O.S. accepted Evans' application. Mem. Supp. Summ. J. at 3, 7-10.

### b) Acceptance of the March Subscription Agreement

The choice-of-law provision in ¶ (19) of each of the Subscription Agreements provides that each shall be governed by and construed in accordance with Arkansas law.[6] Under Arkansas law, similar to New York law, "[w]hen a contract is unambiguous, its construction is a question of law for th[e] court." *Artman v. Hoy*, 370 Ark. 131, 136, 257 S.W.3d 864, 869 (2007) (citations omitted). Neither party asserts that the Subscription Agreements are ambiguous. Once

---

[5] Evans notes that Clark told him that he would be receiving a side letter "that applies and converts [SSN Media's] loan obligation to Limited Partnership Interests in the SSN Funding," which Evans asserts is different from the March Subscription Agreement, and that he never received this side letter. *See* Mem. Supp. Summ. J. Ex. 4 at 5; Evans Aff. ¶ 69. However, Evans does not rely on the absence of this side letter to argue that there was not a valid election to convert the Notes, nor explain whether this contemplated side letter was to serve a function separate from the March Subscription Agreement.

[6] Paragraph 19 of each of the Subscription Agreements states, "This Subscription Agreement and the rights, obligations and relationships of the parties under this Subscription Agreement and the Partnership Agreement and in respect of the SSN Funding, L.P. Limited Partnership Interests shall be governed by and construed in accordance with the laws of the State of Arkansas." March Subscription Agreement ¶ 19; September Subscription Agreement ¶ 19. The Court will enforce this choice-of-law provision as Evans does not claim that there was fraud related to the choice-of-law provision. *See L-3 Commc'ns Corp. v. OSI Sys., Inc.*, No. 02 Civ. 9144 (DC), 2004 WL 42276, at *3 (S.D.N.Y. Jan. 8, 2004); *see also Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 393 (2d Cir. 2001) ("As there are no allegations of fraud, bad faith or unfavorable public policy aspects to the choice-of-law provision, the court will enforce it").

a court determines that the contract is unambiguous, it cannot allow parol evidence to be introduced. *Stokes v. Stokes*, 2016 Ark. 182, 7, 491 S.W.3d 113, 119 (2016); *c.f. P.A.M. Transp., Inc. v. Arkansas Blue Cross & Blue Shield*, 315 Ark. 234, 245, 868 S.W.2d 33, 39 (1993), *as clarified on denial of reh'g* (Jan. 10, 1994). It must "consider the sense and meaning of the words used by the parties as they are taken and understood in their plain and ordinary meaning." *Couch v. Farmers Ins. Co.*, 375 Ark. 255, 258-59, 289 S.W.3d 909, 913 (2008) (citation omitted). The March Subscription Agreement unambiguously states that it is an application by Evans to S.O.S., the General Partner of SSN Funding, to become a limited partner of SSN Funding, and that S.O.S.'s "acceptance of th[e] application shall constitute [Evans] as a Limited Partner [of SSN Funding] on the terms and conditions of the Partnership Agreement as if [Evans was] a party to it." March Subscription Agreement ¶¶ 1-2.

Evans claims that his application was never validly accepted by S.O.S., SSN Funding, nor any entity related to SSN Funding. It is undisputed that none of those entities signed the March Subscription Agreement. SSN Funding nonetheless argues that the application can be accepted in any reasonable manner under Arkansas law, and that Avent's execution of the LPA on May 15, 2013 as the President and CEO of S.O.S. is a reasonable form of acceptance. SSN Funding is correct that under Arkansas law, "[u]nless otherwise unambiguously indicated by the language or circumstances . . . an offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances." Ark. Code Ann. § 4-2-206(1)(a); *see also Erdman Co. v. Phoenix Land & Acquisition, LLC*, No. 2:10 Civ. 2045, 2013 WL 3776349, at *3 (W.D. Ark. July 17, 2013). Evans argues that reference to the "undersigned" in ¶ (6) of the March Subscription Agreement confirms that the document was intended to be counter-signed by SSN Funding. Pl. 56.1 Countstmt. ¶ 21. Plaintiff is mistaken

17

since the "undersigned" in ¶ (6) clearly refers to the subscriber, Evans, not SSN Funding or S.O.S. Paragraph (6) provides that the subscriber only relies on a discrete set of documents in making the subscription including "documents relating to the business of the Partnership provided by its authorized representatives during the course of meetings in person with the undersigned or its authorized representatives." March Subscription Agreement ¶ 6. In other words, ¶ (6) refers to documents provided by SSN Funding, the "Partnership," to Evans, who signed the application, during in-person meetings. If the undersigned was interpreted as SSN Funding or S.O.S., it would render the provision nonsensical by causing the provision to state that Evans is relying on documents that SSN Funding gave to itself or its general partner. The March Subscription Agreement does not contain any provisions specifying the manner in which acceptance must be made by S.O.S., nor does it appear to provide a signature page for S.O.S. to execute the application. Evans also failed to provide the Court with evidence of any circumstances that unambiguously prescribes the method of S.O.S.'s acceptance. Accordingly, the Court finds that S.O.S. could have accepted Evans' offer in any reasonable manner.

However, there is a triable issue of fact concerning whether Avent's signature on the LPA as the President and CEO of S.O.S. constitutes acceptance by S.O.S. The LPA, by its terms, is an agreement between, *inter alia*, S.O.S. and the limited partners whose names and addresses are set out in Annex A to the LPA, "which may be amended from time to time by the addition of new Limited Partners." LPA at 1. If Evans' name and address was listed in Annex A, either in its original or amended iteration, then Avent's signature on the LPA as the President and CEO of S.O.S. could constitute reasonable acceptance. It would not suffice that E&M was listed in Annex A since there is no evidence that the Promissory Notes or the March Subscription Agreement were subsequently assigned or transferred from Evans in his individual capacity to

18

E&M.[7]  However, neither party has provided the Court with Annex A, even though discovery has concluded in the instant action.[8]  Regardless, there is other evidence on the record that create a material dispute as to whether Evans is listed in Annex A as a limited partner in his individual capacity.  First, an email sent by an employee of SSN Funding on August 5, 2014 which attaches "the list of limited partners" lists "James Evans – Evans McConnell" as a limited partner, but Evans appears to have been listed as a representative of E&M, not in his individual capacity.  Mem. Supp. Summ. J. at Ex. 14 at 4.  Second, when Campbell was asked whether the September Subscription Agreement is the operative agreement in SSN Funding's view, he responded by testifying that E&M is the name that is on Annex A, and did not testify that Evans was also included in Annex A in his individual capacity.  Campbell Dep. Tr. 156:2-14.  Third, the SSN Funding balance sheet as of December 31, 2014 lists the limited partners' equity.  Mem. Supp. Summ. J. Ex. 22.  It lists eleven limited partners, including E&M, but does not list Evans individually.  Lastly, SSN Funding only provided a K-1 statement to E&M, not Evans.  Mem. Supp. Summ. J. Ex. 12.  Accordingly, the Court cannot find at this juncture that Avent's execution of the Limited Partnership Agreement on May 15, 2013 constituted reasonable acceptance by S.O.S. of the March Subscription Agreement executed by Evans individually.

### c)  Mutual Assent

Alternatively, SSN Funding argues that the parties' conduct demonstrates that there was

---

[7] The Promissory Notes require prior written consent by the borrower for Evans to assign the Notes to a third party. December Note ¶ 4; March Note ¶ 4.  Furthermore, the limited partnership interest in SSN Funding can only be transferred in accordance with the requirements of LPA ¶ 21.  LPA ¶ 21.  Paragraph 21 provides that the limited partner seeking to transfer his interest must first offer SSN Funding the opportunity to purchase the equity, then certain of the other limited partners.  *Id.*  If no agreement is reached at that juncture, the limited partner can sell the equity to a third party, but any such offer must be communicated in writing to SSN Funding's partners.  *Id.*  SSN Funding has not attempted to demonstrate that any of these steps were taken by Evans to assign or transfer his interests under the Notes and the March Subscription Agreement.

[8] Evans contends that SSN Funding has not made a complete production of documents, *see* Opp. Summ. J. at 9-10, but he failed to file any motion to compel during the discovery period or otherwise raise the issue of SSN Funding's purported deficient production.

sufficient mutual assent by both parties to be bound by the Subscription Agreements. Under Arkansas law, "to make a contract there must be a meeting of the minds as to all terms, using objective indicators." *Alltel Corp. v. Sumner*, 360 Ark. 573, 576, 203 S.W.3d 77, 80 (2005) (citation omitted). Such meeting of the minds may be accomplished by words or conduct. *Childs v. Adams*, 322 Ark. 424, 433, 909 S.W.2d 641, 645 (1995) (citation omitted).

Evans makes four separate arguments that mutual assent to be bound by the March Subscription Agreement could not or did not occur, two of which raise an issue of material fact. First, he claims that only a written agreement between Evans and SSN Media can convert the Notes into equity because ¶ (8) of each of the Promissory Notes provides that they "may not be amended except by an agreement in writing signed by the Borrower [SSN Media] and the Lender [Evans]." December Note ¶ 8; March Note ¶ 8. The Court finds that ¶ (8) unambiguously only applies to *amendments* of the Promissory Notes, and does not require that Evans' election to replace the Promissory Notes must also be in writing. His ability to cancel and replace the Notes is already provided for in the Promissory Notes, and thus, no amendment is required for him to make such election. Therefore, the Court finds as a matter of law that ¶ (8) does not require a writing counter-signed by SSN Funding to convert the Notes.

Second, Evans asserts that he only agreed to convert the loan into equity in SSN Funding on certain conditions that failed to occur. Specifically, he claims that the purported conditions are set forth in the Acknowledgement dated March 15, 2013. Paragraph (g) of that document states, *inter alia*, that he releases SSN Media from any and all claims that he may have upon the issuance to him "of a Limited Partnership Interest in SSN Funding, L.P. corresponding to a $250,000 capital contribution . . . and provided that SSN Funding[,] L.P. shall concurrently therewith issue a minimum of $4,500,000[] in Limited Partnership Interests." Evans Aff. Ex. 8

at 4-5 (emphasis added).  Evans argues that this provision conditioned the entire transaction on the representation that SSN Funding would be raising $4.5 million in capital.  He states that this understanding was further confirmed by his attendant conversations with Clark, which he fails to further describe.  Evans Aff. ¶ 68.  This argument is belied by ¶ (6) of the March Subscription Agreement, which unambiguously states that Evans relies only on a discrete set of documents: the Disclosure Memorandum dated February 25, 2013; other ancillary documents relating to SSN Funding provided by its authorized representatives during the course of in-person meetings with Evans or his authorized representatives; the Partnership Agreement; and any side letter Evans has entered into with SSN Funding and S.O.S.  March Subscription Agreement ¶ 6.  The Acknowledgement was drafted and provided by Evans, there is no evidence that it was a part of the Disclosure Memorandum dated February 25, 2013, and it was not provided by SSN Funding's authorized representatives.  Accordingly, Evans could not have conditioned the transaction on a provision in the Acknowledgement, which does not appear on its face to be assented to by S.O.S. or SSN Funding in any event.

Furthermore, concerning the alleged attendant statements by Clark, ¶ 17(o) of the March Subscription Agreement states that any statements made on behalf of SSN Funding that are "not statements of historical fact, should be considered forward looking statements."  *Id.* at ¶ 17(o).  It further notes that such forward looking statements "involve a number of risks and uncertainties that could cause actual results to differ materially from those suggested by any forward looking statements."  *Id.*  This provision precludes the March Subscription Agreement from being conditioned on any forward looking statements as it expressly states that results suggested in such statements may not occur.  The statement regarding the $4.5 million capital raise is a forward looking statement as it does not refer to an event that already occurred, but refers to an

event that was planned to occur.  Accordingly, the Court finds that consummation of the March Subscription Agreement did not depend on whether SSN Funding was able to make a $4.5 million capital raise.

Third, Evans argues that there is insufficient demonstration of mutual assent because SSN Funding did not treat him as a limited partner.  SSN Funding states that it provided Evans with access to and information about partner meetings, corresponded with him about its management, requested information necessary to provide K-1 statements, provided K-1 statements, notified him of a potentially important transaction, and published a limited partner list with E&M's name and interest value.  None of these actions conclusively demonstrate that Evans was accepted as a limited partner in his individual capacity under the March Subscription Agreement.  For example, Evans makes requests to SSN Funding on behalf of E&M, Mem. Supp. Summ. J. Ex. 13, Ex. 19, the only K-1 statement provided to the Court names E&M as the recipient, *id.* Ex. 12, Evans signed a waiver of confidentiality on behalf of E&M, *id.* Ex. 17, and the SSN Funding balance sheet as of December 31, 2014 lists E&M as a limited partner but not Evans individually, *id.* Ex. 22.  Accordingly, there is a triable issue of fact regarding whether there was sufficient mutual assent by both parties, causing Evans to become a limited partner in his individual capacity under the March Subscription Agreement.  *See e.g. Pine Hills Health & Rehab., LLC v. Matthews*, 2014 Ark. 109, 7–8, 431 S.W.3d 910, 915 (2014) (finding that appellants insufficiently presented evidence concerning any conduct that would have manifested assent by both parties and whether the contract had commenced).

Fourth, Avent testified that the $250,000, the loan from Evans to SSN Media that was supposed to be converted into equity in SSN Funding, was kept in an HSE operating account, including the entirety of the March Note totaling $100,000, which Evans was told would be

placed in an escrow account.  *See* Avent Dep. Tr. 54:24-55:16; 116:10-16; 125:4-126:3.  The LPA provides that if a limited partner fails to make an installment of its commitment on the due date, S.O.S. may "deem the subscription of such Limited Partner, to the extent of the Commitment in default, as being void ab initio."  LPA ¶ 6.2.1(a).  Since there is evidence that $250,000 was diverted by Avent and comingled with an HSE operating account, there is a triable issue of fact as to whether the commitment was ever given to SSN Funding and whether the subscription is void *ab initio* as a result.

In sum, the Court finds that a reasonable factfinder could determine that the March Subscription Agreement was not validly consummated because there is a triable issue as to whether there was mutual assent and as to whether the subscription was void *ab initio*.

### 2. September Subscription Agreement

The September Subscription Agreement was executed by Evans on behalf of E&M on or around September 30, 2013, approximately six months after the time for conversion expired. Def.'s 56.1 Stmt. ¶ 14; Pl.'s 56.1 Counterstmt. ¶ 92.  SSN Funding appears to concede, as it must, that this election was outside the one-year limitation period.  However, it argues that Evans nevertheless timely elected to convert the Notes under the March Subscription Agreement, and thus, that the one-year time limit was not violated.  This argument fails.  If the March Subscription Agreement could not convert the Promissory Notes into equity in SSN Funding, it would have left the Promissory Notes intact including its one-year time limit.  Therefore, any new elections to cancel the Notes would still have had to be made by March 20, 2013 and March 21, 2013 respectively.  Since Evans did not execute the September Subscription Agreement within that requisite time limit, it could not convert the loans into E&M's equity interest in SSN Funding.  Therefore, the Court need not address the parties' other arguments concerning whether

E&M became a limited partner of SSN Funding through the September Subscription Agreement.

### 3. Fraudulent Inducement

Evans further argues that the Subscription Agreements are void because they were procured by fraud. If a contractual choice-of-law provision is not broad enough to expressly govern tort claims, the provision will not apply to a fraudulent inducement claim, and a court must engage in a conflict of laws analysis. *See Oliver Wyman, Inc. v. Eielson*, No. 15 Civ. 5305 (RJS), 2016 WL 5339549, at *3 (S.D.N.Y. Sept. 22, 2016). The parties do not brief which state's law should govern this claim, but Evans cites to New York law and SSN Funding cites to Arkansas law. The Court finds that it need not determine whether the choice-of-law provision is broad enough to encompass the fraudulent inducement claim because the claim fails under the law of both states.

"In order to prove fraud, a plaintiff must prove five elements under Arkansas law: (1) that the defendant made a false representation of material fact; (2) that the defendant knew that the representation was false or that there was insufficient evidence upon which to make the representation; (3) that the defendant intended to induce action or inaction by the plaintiff in reliance upon the representation; (4) that the plaintiff justifiably relied on the representation; and (5) that the plaintiff suffered damage as a result of the false representation." *Wal-Mart Stores, Inc. v. Coughlin*, 369 Ark. 365, 375, 255 S.W.3d 424, 432 (2007). Similarly, a plaintiff must plead the following four elements to make out a claim of fraudulent inducement under New York law: "(i) a material misrepresentation of a presently existing or past fact; (ii) an intent to deceive; (iii) reasonable reliance on the misrepresentation by appellants; and (iv) resulting damages." *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 143 (2d Cir. 2011) (citing *Ross v. Louise Wise Servs., Inc.,* 8 N.Y.3d 478, 488, 836 N.Y.S.2d 509, 868 N.E.2d 189 (2007)).

Evans claims that SSN Funding, through its representatives, informed him that if he released the $100,000 that were purportedly in escrow, the funds would be used to purchase an interest in Gateway, and that they would be held in escrow until SSN Funding raised $4.5 million—an eventuality that never occurred. Opp. Summ. J. at 21. SSN Funding asserts that Evans fails to present any evidence, disputed or otherwise, that any alleged misrepresentations were made with intent or knowledge that the representations were false. The Court agrees. Evans himself provided this Court with an email dated June 2, 2014 in which Clark informed Avent that Evans' investments were to "assist in building a company" and that Evans was offered an interest in Gateway to secure his second tranche investment. Evans Aff. Ex. 7 at 1. Evans was copied on this email communication. *Id.* This email suggests that Clark believed what he had represented to Evans, contradicting any assertions that Clark had intended to misrepresent, or had any reason to believe his representations were false. Accordingly, the Court finds that Evans fails to establish that the Subscription Agreements were procured by fraud.

**4.      Rescission of Subscription Agreements**

Alternatively, Evans requests that the Court allow him to rescind any purchase of equity interest in SSN Funding in order to prevent the Court's diversity jurisdiction from being defeated. Opp. Summ. J. at 22-23. "[W]hether federal diversity jurisdiction exists is determined by examining the citizenship of the parties *at the time the action is commenced*." *Reynolds v. Wohl*, 332 F. Supp. 2d 653, 656 (S.D.N.Y. 2004) (emphasis in original). Therefore, even if the Court were to allow rescission, it would not affect the Court's diversity jurisdiction in the instant action since the pertinent inquiry is whether Evan had an equity interest in SSN Funding when he filed the Complaint.

Nevertheless, the Court finds that diversity jurisdiction is not defeated at this juncture

because it finds that there are sufficient triable facts concerning whether the parties ever consummated the March Subscription Agreement, and that the September Subscription Agreement is void for violating the one-year time limit set forth in the Promissory Notes. Accordingly, there are triable issues of fact concerning whether Evans ever validly became a limited partner of SSN Funding.

### 5. Amendment of the Complaint

Evans further states that if the Court feels constrained by the lack of an affirmative allegation of fraud relating to the execution of the Subscription Agreements, he seeks leave to re-plead the Complaint in a curative manner. The Court finds that an amendment is unnecessary as it finds that summary judgment is not warranted.

### B. Contractual Debt

SSN Funding advances the same arguments in asserting lack of subject matter jurisdiction to claim that there is no contractual debt under the Promissory Notes. The Court determines that, for the same reasons discussed above, there are triable issues of fact as to whether SSN Funding owes Evans contractual debt payments. Therefore, summary judgment is not warranted.

## IV. Conclusion

For the aforementioned reasons, SSN Funding's motion for summary judgment is DENIED.

The parties are directed to appear for a status conference on Tuesday, September 12, 2017 at 10:30 a.m.  The Clerk of the Court is respectfully directed to terminate the motion, Doc. 61.

It is SO ORDERED.

Dated:    August 23, 2017
          New York, New York

Edgardo Ramos, U.S.D.J.