UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JAMES T. EVANS,

                              Plaintiff,

          – against –

SSN FUNDING, L.P., EDWIN AVENT, HSE,
INC., and HSE, LLC,

                              Defendants.

---

**OPINION AND ORDER**

15 Civ. 5514 (ER)

**Ramos, D.J.:**

James T. Evans ("Evans") brings this action in diversity against SSN Funding, L.P.

("SSN Funding") for breach of two promissory notes, against Edwin Avent ("Avent") for breach

of fiduciary duty and negligent misrepresentation, and against Avent, HSE, Inc. and HSE, LLC

(together, "HSE") (collectively, "Defendants"), for conversion and an accounting, and for fraud

against all Defendants.  After a four-day trial before this Court, a jury found that SSN Funding

had procured one of the promissory notes by fraud, and awarded Evans compensatory and

punitive damages.  Schoenstein Aff., Doc. 101, Ex. 1, Verdict Sheet, at 4–5.  The jury, however,

rejected Evans' breach of contract claim against SSN Funding, concluding that Evans had

converted the promissory notes into an equity interest in SSN Funding.  *Id.* at 1.  The jury found

the remaining Defendants not liable on all claims brought against them.  *See* Verdict Sheet.

Before the Court are Evans and SSN Funding's post-trial motions:  Evans moves the

Court for entry of judgment as a matter of law, or a new trial, pursuant to Federal Rule of Civil

Procedure 50(b) and 59, respectively, Doc. 99, arguing that the jury's finding of conversion lacks

support in the record.  SSN Funding asks the Court to deny Evans' motion as baseless and

dismiss the case, arguing that the jury's finding of conversion renders Evans a limited partner of

SSN Funding and destroys diversity jurisdiction. Alternatively, SSN Funding moves for judgment as a matter of law pursuant to Rule 50(b), on the basis that the jury's finding of fraud as to SSN Funding is inconsistent with its finding absolving Avent of liability for fraud. Doc. 106. For the reasons set forth below, both parties' motions are DENIED, and the case is dismissed for lack of subject matter jurisdiction.

## I.    BACKGROUND

### A.    Factual Background

The Court assumes familiarity with the record and its prior summary judgment opinion, which details the facts and procedural history of this case, and discusses here only those facts necessary for its disposition of the instant motion. *See Evans v. SSN Funding, L.P.*, No. 15 CIV. 5514 (ER), 2017 WL 3671180 (S.D.N.Y. Aug. 23, 2017) (the "Summary Judgment Opinion").

As relevant here, this dispute stems from Evans' $250,000 investment in the Soul of the South Network ("Soul of the South"), a regional broadcast television network that caters to an African-American audience, in which SSN Funding holds an indirect interest. Defs.' 56.1 Stmt. ¶ 5.[1]

#### 1.    Promissory Notes

On December 12, 2011, Evans and SSN Media Group, LLC ("SSN Media LLC"), another entity related to SSN Funding, executed a promissory note pursuant to which Evans lent

---

[1] Evans is an attorney residing in New York City. Defs.' 56.1 ¶¶ 1–2; Pl.'s 56.1 Counterstmt. ¶ 31. SSN Funding is an Arkansas limited partnership with its principal place of business in Arkansas, and is the successor-in-interest to SSN Media Group, Inc. ("SSN Media"). Defs.' 56.1 ¶ 4; Pl.'s 56.1 Counterstmt. ¶ 32. Avent, a citizen of the State of Maryland, was the Chairman and CEO of SSN Media, SSN Funding, S.O.S. Media Holdings, Inc. ("S.O.S."), and HSE at all relevant times. Pl.'s 56.1 Counterstmt. ¶ 34; LPA at 65. HSE, Inc. was a Maryland corporation with its principal place of business in Maryland. Pl.'s 56.1 Counterstmt. ¶ 35.

SSN Media LLC $150,000 (the "December Note").[2]  Schoenstein Aff., Ex. 3, December Note;

Schoenstein Aff., Ex. 4, Tr. 41:11–24.  Several months later, on March 20, 2012, Evans and SSN

Media executed a second promissory note for $100,000 (the "March Note").  Schoenstein Aff.,

Ex. 4, March Note; Tr. 43:24–44:2.  Both the December and March Notes (together, the

"Promissory Notes") allowed Evans to elect to cancel the Notes within one year—by March 20,

2013 and March 21, 2013 respectively—and receive "in lieu thereof, such other securities and/or

notes and/or agreements and/or instruments as shall be similar to other securities and/or notes

and/or agreements and/or instruments which may be issued to any other lender [] or investor in

the Borrower."  *See* December Note at 1; March Note at 1.  In other words, the Notes permitted

Evans to convert the loans he made to SSN Media to equity in the company, but only if he

exercised that right within one year.

At trial, Evans testified that before executing the March Note, he spoke to two

representatives of Soul of the South, Frank Mercado-Valdes ("Mercado-Valdes") and Chris

Clark ("Clark").  Tr. 44:2–16.  According to Evans, he "was very hesitant" to lend additional

funds to Soul of the South because "[he] didn't know" how his initial investment was being used

and was leery of continuing to invest in a startup that had not yet secured sufficient funding to

commence operation.  Tr. 45:8–12, 46:1–2.  To hedge against this concern, the parties agreed

that the proceeds from the $100,000 March Note would be placed in an escrow account and

would not be utilized for any purpose unless and until a total of $2 million was raised for Soul of

the South.  Tr. 124:9–10 (Evans stating that "this second investment was to be in escrow until

SSN reached $2 million in investment"); *see also* Tr. 35:25–36:2, 39:16–17, 45:21–25, 156:3–5.

Consistent with this understanding, upon wiring the funds, Evans emailed Clark to verify that

---

[2] The December Note was amended on March 21, 2012 to assign SSN Media LLC's rights to SSN Media.  *See* Doc. 101 Ex. 3 at 1; Tr. 53:20–25.

they would be held in an "escrow account and not the checking account . . . . until funds are collected from other lenders." Tr. 51:1–6 (quoting Doc. 101, Ex. 5, March 21, 2012 Email Chain from Evans to Clark). In response, Clark confirmed that that was "[t]he plan." Tr. 51: 7–18.[3]

Despite these representations, and unbeknownst to Evans, the funds were never placed in escrow. *Id.* 51:19–24. Instead, Avent placed the funds in an HSE operating account where they were comingled with the funds therein and used to pay for the day-to-day operations of SSN Media. Tr. 122–123:2; Tr. 263:24–264:13, 277:15–20 (Avent testifying that HSE and SSN funds were comingled in the same account). At trial, Avent testified that he "only did with [Evans'] investment as [he] was directed by . . . Clark", that "[a]n escrow account was never established, and [that he] was never instructed to transfer [Evans'] money into an escrow account." Tr. 277:15–24.

Evans testified that Mercado-Valdes and Clark approached him in June 2012 and asked if he would authorize the release of the $100,000 from escrow so that SSN Media could purchase an interest in SSN Media Gateway, LLC ("Gateway").[4] Tr. 59:13–60:14. He agreed to release the funds, but only for this purpose. Tr. 61:1–18. To memorialize that agreement, Clark sent Evans a Memorandum of Understanding that was purportedly signed by Avent, among others. Tr. 64:8–65:14; Memorandum of Understanding, Doc. 101, Ex. 6. SSN Funding, however, never received an interest in Gateway. Tr. 67:11–12. Instead, Avent acquired a $100,000 interest in Gateway on behalf of HSE. Tr. 67:16–22, 263:6–23. At trial, Avent confirmed that Evans did not have an interest in Gateway. Tr. 265:16–22. Indeed, Avent asserted that he

---

[3] Notably, nothing in the March Note stipulated that the funds would be held in escrow. *See* March Note; Tr. 157:6–10.

[4] Evans testified that Gateway was formed to purchase a mechanism that would allow the Soul of the South network to send media feed in a faster and less cost intensive manner. *See* Tr. 59:25–60:8; Memorandum of Understanding at 1 (noting that the funds would be used to "acquire the Central Automated Satellite Hub," which would be "leverage[ed] . . . to operate Soul of the South Network").

"would have never signed any document that included James Evans having a hundred thousand dollars in the media Gateway because that was not true," and that Clark had forged his signature on the Memorandum of Understanding, which Avent claimed he had not previously seen. Tr. 264:14–265:15. As far as Avent was concerned, Clark "outright lie[d]" to Evans and "forged" Avent's signature to give the fraudulent transaction the appearance of validity. Tr. 266:2–16.

## 2. Subscription Agreements

In late 2012, Clark approached Evans with the possibility of converting the $250,000 of debt into an equity interest in SSN Funding. Tr. 68:3–21. Evans testified that he informed Clark that he was "very uncomfortable" with the idea of converting his Promissory Notes to equity, because he "just really wanted to get paid." Tr. 70:10–12. By simply holding on to the Promissory Notes, which would mature in December 2013, Evans had a low risk way to ensure he would recover his loan proceeds. December Note ¶ 2; March Note ¶ 2. As such, Evans informed Clark that "the only way that [he] would" agree to convert his Promissory Notes to equity was if he could condition the conversion of his notes on SSN Funding raising $4 million. Tr. 70:14–24. Pursuant to this planned transaction, in March 2013, Clark asked Evans to execute a subscription agreement (the "March Subscription Agreement"), Tr. 162:8–11, which upon signature and acceptance by SSN Funding, would convert Evans' Promissory Notes to an equity interest in SSN Funding.[5] Evans testified that Clark also sent Evans a Limited Partnership Agreement ("LPA"), which would memorialize Evans' limited partnership in SSN Funding, and a side letter. Tr. 165:4–10. On March 18, 2013, Evans signed the March Subscription Agreement with a commitment of $250,000, described as convertible interests, and emailed the

---

[5] The March Subscription Agreement states that upon S.O.S.' "acceptance of this application," Evans will become a "[l]imited [p]artner [of SSN Funding] under the terms and conditions of the Partnership Agreement." March Subscription Agreement ¶¶ 1-2. Moreover, it states that the commitment will be treated as equity for United States federal tax purposes. *Id.* at ¶ 17(l).

agreement to Clark, along with an executed copy of the LPA and an "Acknowledgment" signed by Evans. *See* Schoenstein Aff., Doc. 101, Ex. 7, March 18, 2013 Email from Evans to Clark attaching signed Subscription Agreement, Executed Limited Partnership Agreement, and Acknowledgment. Evans concedes that at that point it was his "intention to become a limited partner of SSN," Tr. 162:20–24, though he asserts that he was never informed that the March Subscription Agreement was "accepted" by SSN Funding, Tr. 105:1–6.

At trial, Evans insisted that the Acknowledgement that he attached to the March 18 email was a "side letter" that was drafted by Clark and had been discussed between the parties, although Evans offered no documentary proof that the Acknowledgment originated with Clark. Tr. 165:16–18. As relevant here, the Acknowledgment states that SSN Funding would only convert Evans' Promissory Notes to equity upon raising and issuing $4.5 million in limited partner interest. *See* Acknowledgment, Schoenstein Aff., Doc. 101, Ex. 7, ¶ (g) (providing that Evans releases SSN Media from any and all claims that he may have upon the issuance to him "of a Limited Partnership Interest in SSN Funding, L.P. corresponding to a $250,000 capital contribution . . . and provided that SSN Funding[,] L.P. shall concurrently therewith issue a minimum of $4,500,000[] in Limited Partnership Interests"). On cross examination, Evans acknowledged that the "side letter" was "drafted . . . in the first person," as if it were written by Evans, was signed only by Evans, and was an offer from Evans to SSN Funding. Tr. 165:19–24, 169:7–13, 170:3–9. Defense counsel also noted that the Paragraph 6 of the March Subscription Agreement contains an anti-reliance provision, which provides:

> "[The subscriber(s)] confirm that our subscription for limited partnership interests . . . in, and our Commitment to, the Partnership is made solely on the basis of the information contained in a Disclosure Memorandum dated February 25[,] 2013, and other ancillary documents relating to the business of the Partnership provided by its authorized representatives during the course of meetings in person with the undersigned or its authorized representatives, the Partnership Agreement, any side

letter we have entered into with the Partnership and the General Partner and this Subscription Agreement . . . and not in reliance on any other information, representations or warranties, whether oral or written, provided by any Person including for the avoidance of doubt[,] the General Partner or any Affiliate thereof or any officer, agent, director, member, partner or employee of any such Person."

Tr. 166:22–167:12 (quoting March Subscription Agreement ¶ 6).  In effect, Defense counsel argued that since the "side letter" was not signed by the SSN Funding partnership, it was not the kind of side letter contemplated by Paragraph 6.  Tr. 169:1–170:10.  Defense counsel further noted that the March Subscription Agreement contained a forward looking statement, which provided in pertinent part:

Any statements made on behalf of the Partnership that are not statements of historical fact, should be considered forward looking statements.  Such statements include, without limitation, those relating to the Partnership's future business prospects, business plans, revenues, expenditures, capital needs, and income.  [The subscriber(s)] acknowledge that such statements are estimates reflecting the best judgment of the Partnership and involve a number of risks and uncertainties that could cause actual results to differ materially from those suggested by any forward looking statements."

Tr. 171:18–172:2 (quoting March Subscription Agreement ¶ 17(o)).

Relying on that provision, Defense counsel asked Evans whether he ever "raised an objection about the inherent contradiction" between the Acknowledgment conditioning Evans' partnership interest on SSN Funding raising $4.5 million and the March Subscription Agreement's forward looking statement clause.  Tr. 174:11–175:1.  Evans responded that he did not raise an objection because he did not view the statements as contradictory.  Tr. 174:18. Evans thus maintained that he understood the documents he executed would not become final, and his Promissory Notes would not be converted into equity, until SSN Funding met the $4.5 million capital raise threshold.  Tr. 176:1–10, 185:8–20.  Two months after Evans executed the March Subscription Agreement and the LPA, on May 15, 2013, Avent signed the LPA. Schoenstein Aff., Ex. 8, LPA at 1, 65.  Avent testified that when he signed the LPA he had "the

authority to bind the company to Evans" and "[a]bsolutely" considered Evans a limited partner of SSN Funding at that point in time. Tr. 290:16–291:12. On cross examination, Avent acknowledged that the LPA provided that the limited partners' names would be listed on an Annex A, and that the LPA that was provided to Evans did not contain an Annex A. Tr. 395:7–18. Avent stated that that "probably is the case because Mr. Evans [was] the first limited partner [and] he would [have been] the only one that would be on the [A]nnex." *Id.* No Annex A was ever entered into evidence.

Several months later, on September 30, 2013, Evans signed a second subscription agreement, but this time Evans executed the agreement on behalf of Evans & McConnell, LLC ("E&M") as the prospective subscriber with a commitment of $350,000, instead of $250,000 ("September Subscription Agreement"). Schoenstein Aff., Ex. 9, September Subscription Agreement at 1, 9. As Evans explained at trial, Clark wanted SSN Funding to remain a "minority-owned business" so that the venture was eligible for additional funding and programming opportunities that were set aside for such businesses. Tr. 108:18–109:4. Thus, Clark asked Evans, who is a minority, to combine his equity stake with a non-minority investor named Peter Moore. The idea was that Evans and Moore could funnel their investments through an LLC so that SSN Funding could continue to claim minority status. *Id.* 108:22–109:24. Evans consented to that arrangement and, in May 2013, filled out the necessary paperwork and "paid to form" the E&M LLC. *Id.* 109:25–110:14. Evans conceded that Moore is not in fact a member of E&M—that Evans is its sole member—and that Moore's $100,000 investment was only channeled through E&M. Tr. 113: 4–6. Thus, there is no dispute that $250,000 of the $350,000 commitment was the same $250,000 Evans initially loaned to SSN Media through the

Promissory Notes, and that the remaining $100,000 was Moore's. *See* Tr. 115:21–23, 183:1–9. Evans does not know if Moore is even a limited partner of SSN Funding. Tr. 183:12–14.

The September Subscription Agreement provides: "NOTE: This subscription agreement encompasses Moneys already received and acknowledged by SSN Funding and creates no new obligations for subscriber herein." September Subscription Agreement at 1. It otherwise contains the same provisions as the March Subscription Agreement. *See id.*

In a September 30, 2013 email exchange in which Clark asked Evans to execute the September Subscription Agreement, Clark wrote, "it[']s the same thing you already signed. This is just a new subscription agreement. I will take care of the rest of the information." Doc. 63, Ex. 7 at 3; Tr. 114–115. Likewise, Douglas McHenry, the CEO of SSN Funding, Tr. 417:20–21, explained that the $250,000 that Evans invested to enter the "original . . . Evans . . . limited partnership agreement that he signed as a single individual" was "[t]he same $250,000" invested through E&M. *Id.* 435:1–15. McHenry expounded: "So we can talk about the sophistry of this company versus that company. In the end, James Evans whether it is through the [March Subscription Agreement] or the [September Subscription Agreement], is a limited partner." *Id.* 435:16–19.

### 3. Parties' Course of Conduct

At trial, there was little dispute that Evans was treated as a limited partner for at least some period of time. Evans conceded that following the execution of the September Subscription Agreement he was treated as a limited partner of SSN Funding and "conduct[ed]" himself as such. Tr. 184:6–16. In this regard, Evans acknowledged that he "was invited to several [limited partner] meetings," Tr. 184:15–16, and that he attended "[m]aybe seven" of those limited partner meetings, that he "sent and received" emails in his capacity as a limited

partner, Tr. 118:1–14, and that he "raised objections under the ambit of being a limited partner." Tr. 119:8–10. According to Evans, however, he only conducted himself as a limited partner on behalf of E&M, and not in his individual capacity. Tr. 118:10–17. Evans also noted that E&M received K-1 tax statements, though Evans never filed that form as part of his or E&M's tax returns. Tr. 120:9–24. Notwithstanding these admissions, Evans asserts that SSN Funding did not treat him the same as other limited partners were treated, and that as a result Evans drafted a shareholder derivative demand letter, but never formally filed a complaint, and never received a response from SSN Funding. Tr. 119:10–120:8.

Testimony from the other members of SSN Funding indicated that Evans was indeed treated like a limited partner. Avent specifically testified that, despite his druthers, following Evans' execution of the LPA he considered Evans a limited partner and treated him as such. Tr. 290:16–291:12; 391:11–14 (stating that Evans was the "first limited partner to sign the limited partnership agreement"). William Campbell, an SSN Funding representative, provided corroborating testimony. At his deposition, which was read into the record at trial, Campbell asserted that Evans was treated as an SSN Funding limited partner, stating that the limited partnership held "four or five" telephonic meetings and that Evans "was always invited to participate . . . and a number of times he did." Tr. 308:13–18. Similarly, McHenry testified at trial that "Evans was one of the larger limited partner stakeholders [in SSN Funding]." Tr. 426:10–13. He further testified, ostensibly as proof of Evans' active role as a limited partner, that Evans "certainly was aware of, . . . and I believe was ultimately in favor of, [SSN Funding being acquired by another entity]." Tr. 426:10–15. Finally, McHenry noted that prior to the lawsuit Evans never claimed that he was owed money on the Promissory Notes, Tr. 424:22–25.

**B.     Procedural History**

On February 28, 2017, SSN Funding filed a motion for summary judgment, arguing that because Evans converted the Promissory Notes into an equity interest in SSN Funding, there was no diversity of citizenship, and moreover, no contractual debt to enforce.  Doc. 61.  On August 23, 2017, the Court denied SSN Funding's summary judgment motion, reasoning that there were triable issues of fact.  Specifically, the Court concluded that there was a triable issue regarding "whether there was sufficient mutual assent by both parties, causing Evans to become a limited partner in his individual capacity under the March Subscription Agreement."  Summary Judgment Opinion at *10.  Next, because there was evidence that some portion of the $250,000 loan was diverted by Avent and comingled with an HSE operating account, there was a triable issue on whether that loan "was ever given to SSN Funding and whether the [March] [S]ubscription is void *ab initio* as a result."  *Id.*  Finally, the Court determined that there was a genuine dispute of material fact as to Evans' claim that the Subscription Agreements were void *ab initio* because they were procured by fraud.  *Id.* at *11.

A four day trial was held from October 23–26, 2017.[6]  On October 26, the jury rendered its verdict.  Verdict Sheet at 16.  The jury concluded that SSN Funding was not liable for breach of contract, *i.e.*, that Evan was not entitled to the return of his initial $250,000 loan, finding that Evans had converted his Promissory Notes to equity.  Verdict Sheet at 1, No. 1.  The jury also found that SSN Funding was liable for fraud in connection with the March Note and awarded

---

[6] During the course of the trial, the parties moved for judgment as a matter of law on a range of claims.  Defendants sought judgment as a matter of law on Plaintiff's breach of fiduciary duty, negligent misrepresentation, conversion, and fraud claims.  Tr. 316–317, 331:17–20.  The Court denied those motions on the basis that their resolution turned on issues of fact that should be decided by the jury.  Tr. 327:16–20, 331:12–15, 334:20–25.  Plaintiff also sought judgment as a matter of law on their conversion claim, asserting that the witnesses uniformly testified that E&M was treated as a limited partner, and not Evans in his individual capacity.  Tr. 335–336.  The Court likewise denied that motion on the grounds that there was "a basis for the jury to determine that by executing [the March Subscription Agreement], Mr. Evans became a limited partner."  Tr. 336:24–337:1.

Evans $100,000 plus interest in compensatory damages, and $75,000 in punitive damages. Verdict Sheet at 4–5, Nos. 12, 17–18. In contrast, the jury absolved Avent and the remaining Defendants from liability for fraud. Verdict Sheet at 2, 6–8, Nos. 5, 19, 26. The jury returned a verdict of non-liability on the remaining claims of negligent misrepresentation, breach of fiduciary duty, and conversion. Verdict Sheet at 10–15.

## II. LEGAL STANDARD

### A. Judgment as a Matter of Law and New Trial

Judgment as a matter of law may not properly be granted under Federal Rule of Civil Procedure 50(b) unless the evidence, viewed in the light most favorable to the opposing party, is insufficient to permit a reasonable juror to find in his favor." *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.* 136 F.3d 276, 289 (2d Cir. 1998); *see also MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 180 (2d Cir. 2016) (where a jury has returned a verdict in favor of the non-movant, a court may grant judgment as a matter of law to the movant "only if the court, viewing the evidence in the light most favorable to the non-movant, concludes that a reasonable juror would have been compelled to accept the view of the moving party.") (quoting *Cash v. Cty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011))); *see also* Fed. R. Civ. P. 50(a) (A court may grant a motion as a matter of law "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."). A party seeking judgment as a matter of law bears a "'particularly heavy'" burden "where, as here, 'the jury has deliberated in the case and actually returned its verdict' in favor of the non-movant." *Cash*, 654 F.3d at 333 (quoting *Cross v. N.Y.C. Transit Auth.*, 417 F.3d 241, 248 (2d Cir. 2005)). A court should accordingly set aside a jury's verdict only "where there is such a complete absence of evidence supporting the verdict that the jury's

findings could only have been the result of sheer surmise and conjecture, or there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against him." *Vangas v. Montefiore Med. Ctr.*, 823 F.3d 174, 180 (2d Cir. 2016) (alteration in original) (quoting *Stampf v. Long Island R.R. Co.*, 761 F.3d 192, 197 (2d Cir. 2014)). In deciding such a motion, "'[t]he court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury,' and 'must disregard all evidence favorable to the moving party that the jury is not required to believe.'" *ING Glob. v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 97 (2d Cir. 2014) (quoting *Tolbert v. Queens Coll.*, 242 F.3d 58, 70 (2d Cir. 2001)).

Pursuant to Rule 59(a), a court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). The standard under Rule 59(a) is less stringent than that of Rule 50 in two respects: "(1) a new trial under Rule 59(a) 'may be granted even if there is substantial evidence supporting the jury's verdict,' and (2) 'a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner.'" *Manley v. AmBase Corp.*, 337 F.3d 237, 244–45 (2d Cir. 2003) (quoting *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133–34 (2d Cir. 1998)). "That being said, for a district court to order a new trial under Rule 59(a), it must conclude that the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice, *i.e.*, it must view the jury's verdict as against the weight of the evidence." *Id.* (internal citation and quotation marks omitted).

## III.    DISCUSSION

### A.    Judgment as a Matter of Law

Evans contends that he is entitled to judgment as a matter of law because the evidence at trial demonstrates that there was no meeting of the minds sufficient to convert the Promissory Notes to an equity interest in SSN Funding, Pl.'s Mem., Doc. 100, at 15, and that the jury's finding of fraud against SSN Funding renders the conversion void *ab initio*, *id.* at 19.  By contrast, SSN Funding asserts that Evans' motion is meritless because the trial record adequately supports the jury's finding of conversion, and that that finding destroys diversity and requires dismissal of the case for lack of subject matter jurisdiction.  Defs.' Mem., Doc. 107, at 15–18.  In addition, SSN Funding argues that the jury's finding of fraud does not void the conversion, because it runs counter to the law of the case.  *Id.* at 15.  Alternatively, SSN Funding asks the Court to grant its motion for judgment as a matter of law on the basis that the jury's finding of fraud against SSN Funding is inconsistent with the jury's finding of non-liability as to Avent, the only SSN Funding agent named as a defendant in this case.  *Id.* at 20.

#### 1.    Mutual Assent

In substance, Evans seeks to undermine the jury's finding of mutual assent in three ways.

##### a)  The Acknowledgement

First, the core of Evans' argument turns on the Acknowledgement that he submitted with the March Subscription Agreement.  Evans asserts that although he signed the March Subscription Agreement, Paragraph (g) of the Acknowledgement conditioned the conversion of his Promissory Notes on the fulfillment of a condition precedent:  that SSN Funding would raise $4.5 million in capital and issue that equity contemporaneous with the conversion of Evans' Promissory Notes.  *See* Acknowledgment, Schoenstein Aff., Doc. 101, Ex. 7, ¶ (g) (providing

that Evans releases SSN Media from any and all claims that he may have upon the issuance to him "of a Limited Partnership Interest in SSN Funding, L.P. corresponding to a $250,000 capital contribution . . . and provided that SSN Funding[,] L.P. shall concurrently therewith issue a minimum of $4,500,000[] in Limited Partnership Interests").  Because that condition was never satisfied, the logic goes, the March Subscription Agreement was never consummated and the Promissory Notes were never converted to equity.  *See* Pl.'s Mem. at 18 ("[O]ne of two things is true.  Either the parties agreed to convert Evans' loans into equity, but only if the predicate capital raise of $4.5 million was achieved, or Evans and SSN simply failed to achieve a meeting of the minds on any agreement.").  This argument fails because it is contrary to the settled law of the case.  *See Musacchio v. United States*, 136 S. Ct. 709, 716 (2016) ("The law-of-the-case doctrine generally provides that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.") (quotation marks and citation omitted).

Specifically, as SSN Funding notes, Defs.' Mem. at 16, at summary judgment the Court rejected this very argument, concluding that, as a legal matter, the "consummation of the March Subscription Agreement did not depend on whether SSN Funding was able to make a $4.5 million capital raise."  Summary Judgment Opinion at *10.  In reaching that conclusion, the Court based its decision on several factors.  For one, the Court reasoned that Evans' claim was "belied by ¶ (6) of the March Subscription Agreement, which unambiguously states that Evans relies only on a discrete set of documents" in entering into the March subscription Agreement, none of which encompassed the Acknowledgement at issue.  *Id.* at *9 (citing March Subscription Agreement ¶ 6).  At that time, Evans claimed to have written the Acknowledgement, so it could not have been an ancillary document "relating to the business of the Partnership provided by its

authorized representatives during the course of meetings in person with the undersigned or its authorized representatives," as required by the March Subscription Agreement. March Subscription Agreement ¶ 6. Furthermore, because the Acknowledgment was unilaterally drafted and signed by Evans, the Court found that Evans could not have conditioned the transaction on a provision in the Acknowledgment that was not assented to by S.O.S. or SSN Funding. *Id.* Finally, the Court noted that Paragraph 17(o) of the March Subscription Agreement provided "that any statements made on behalf of SSN Funding that are 'not statements of historical fact, should be considered forward looking statements,'" to which the Partnership could not be bound. *Id.* at *10 (quoting March Subscription Agreement ¶ 17(o)). Accordingly, the Court explained, the provision precludes the March Subscription Agreement from being conditioned on any forward looking statements allegedly made by Clark concerning the raising of $4.5 million in capital. *Id.* That reasoning at summary judgment continues to provide a sufficient basis for rejecting Evans' claim post-trial.

In any event, the Court need not rely on the law of the case doctrine because the evidence at trial amply supports the jury's finding. *See Musacchio*, 136 S. Ct. at 716 ("The [law of the case] doctrine 'expresses the practice of courts generally to refuse to reopen what has been decided,' but it does not limit [courts'] power.'" (quoting *Messenger v. Anderson*, 225 U.S. 436, 444 (1912)) (second alteration in original). At trial, following discussions at sidebar, the Court admitted the Acknowledgement into evidence and the parties argued its significance to the jury. Evans' testified that the Acknowledgement was "a side letter that goes together with the agreement" as permitted by Paragraph 6, and that the side letter "was drafted by Chris Clark" and given to him for signature.[7] Tr. 99:10–24; 105:1–106:16; 168:5–25; 170:10–171:2. SSN

---

[7] Notably, in his summary judgment affidavit, Evans stated that Clark sent him March Subscription Agreement and the execution page for the LPA, but he does not assert that Clark sent him the Acknowledgment. Evans Aff., Doc.

Funding, by contrast, argued that the Acknowledgment was drafted by Evans and not by Clark, explaining that Paragraph 6 permits Evans to rely on side letters only when they were "'entered into [between Evans and] the partnership,'" that the Acknowledgement contained only Evans signature, that it was written in Evans' first-person voice, and was addressed to the SSN Funding partnership. Tr. 169:5–13 (quoting Acknowledgment ¶ 6), 451:3–452:25. The jury was left to determine whether the document labeled "Acknowledgement" was intended to serve as a "side letter" as contemplated by Paragraph 6, or was the kind of "oral or written" "information, representation[] or warrant[y]," on which Evans could not rely. March Subscription Agreement ¶ 6. Having heard the evidence, the jury concluded that it was the latter. Because it cannot be said that the jury's determination "could only have been the result of sheer surmise or conjecture," or that there is "such an overwhelming amount of evidence in favor of" Evans, the jury's findings cannot be disturbed. *Song v. Ives Laboratories, Inc.*, 957 F.2d 1041, 1046 (2d Cir. 1992) (quoting *Mattivi v. South African Marine Corp.*, 618 F.2d 163, 168 (2d Cir. 1980)).

### b) Course of Conduct

Next, Evans contends that the parties' conduct confirms that SSN Funding did not consider him a limited partner. Specifically, Evans suggests that Avent's failure to state at trial that his signature constituted acceptance somehow negates the signature's legal force, and that the absence of Annex A, which lists the names of the limited partners, precludes a finding that Evans was a limited partner. Pl's Mem. at 16–17; Pl.'s Reply, Doc. 110, at 4. But as SSN Funding notes, Avent was not required to testify to a legal conclusion. Defs.' Reply, Doc. 114, at 2–3; *see United States v. Crawford*, 239 F.3d 1086, 1090 (9th Cir. 2001) (noting that a "lay witness may not . . . testify as to a legal conclusion"), *as amended* (Feb. 14, 2001) (citing

---

69, ¶ 65. Likewise, Evans claimed that although he was told that he would "would receive a 'side letter,'" he "d[id] not recall ever receiving or signing such a letter." *Id.* ¶ 69.

*Evangelista v. Inlandboatmen's Union of Pacific*, 777 F.2d 1390, 1398 n. 3 (9th Cir. 1985));

*United States v. El-Mezain*, 664 F.3d 467, 511 (5th Cir. 2011) (holding that it is generally

prohibited for a lay witness to give legal opinions). Moreover, there is no dispute that the LPA

bears Avent's signature and that he testified that he signed the agreement. Tr. 290:16-291:12.

Additionally, Avent testified that he knew Evans had already signed the execution pages of the

March Subscription Agreement and the LPA at the time Avent executed the LPA, Tr. 290:16–18;

391:1–14, and that by signing the LPA he "[a]bsolutely" thought "Evans had become a limited

partner of SSN Funding," Tr. 290:25–291:4. Although no party ever produced Annex A to the

LPA, that issue was raised and argued by Evans at trial. Tr. 477:12-25. The jury was entitled to

weigh the evidence proffered by the parties and make a determination as to whether Avent

accepted Evans' offer to cancel the Promissory Notes and convert them to an equity interest.

The jury concluded that the documentary and testimonial evidence by Avent outweighed the

absence of Annex A. This conclusion, in the Court's view, is not unreasonable.

Likewise, despite Evans' argument to the contrary, the parties' course of conduct

provides support for the conclusion that there was mutual assent. Avent specifically testified that

following Evans' execution of the LPA he considered Evans a limited partner and treated him as

such. Tr. 290:16–291:12 (noting that when Avent signed the LPA he had "the authority to bind

the company to Evans" and "[a]bsolutely" considered Evans a "limited partner of SSN Funding"

after Avent signed the LPA), 391:11–14 (stating that Evans was the "first limited partner to sign

the limited partnership agreement"). Campbell's deposition testimony further supports the view

that Evans was treated as an SSN Funding limited partner, stating that the limited partnership

held "four or five" telephonic meetings and that Evans "was always invited to participate . . . and

a number of times he did." Tr. 308:13–18. Similarly, McHenry testified at trial that "Evans was

one of the larger limited partner stakeholders [in SSN Funding] and certainly was aware of, . . . and I believe was ultimately in favor of [SSN Funding being acquired by another entity]." Tr. 426:10–15. And, at trial, Evans conceded that, at least as a representative of E&M, he attended "[m]aybe seven" limited partner meetings, that he "sent and received" emails in his capacity as a limited partner, and that he "raised objections under the ambit of being a limited partner." Tr. 118:1–14. Thus, by Evans' own admission he thought of himself, at least in his capacity as a representative of E&M, as a limited partner of SSN Funding.

Evans, however, disputes the relevance of his attendance and actions as a limited partner, claiming that those board meetings occurred after the September Subscription Agreement was signed, and therefore "does nothing to establish that the parties viewed the March Subscription Agreement as effective." Pl.'s Mem. at 19 (citing Tr. 117:10–118:17). That evidence is certainly more probative that Evans acted as a limited partner after the September Subscription Agreement was executed, but it does not mean that the jury is without basis to conclude, in conjunction with Avent's testimony and the documentary evidence, that Evans became a limited partner after executing the March Subscription Agreement and the LPA. After all, SSN Funding was not even formed until several months after Evans executed the LPA, thereby obviating the need for limited partner meetings in the months directly after SSN Funding's formation. *See* LPA at 1, 65.

### c) The Effect of the September Subscription Agreement

Finally, Evans asserts that his post-September participation in the limited partnership is irrelevant because the September Subscription Agreement could not have converted the Promissory Notes to equity since, as the Court has previously noted, Evans had to elect to cancel the Notes within one year of their execution, *i.e.*, by March 2013. Pl.'s Mem. at 19. In that

connection, Evans contends that because the testimony at trial was that E&M, and not Evans, was listed on Annex A to the LPA, Evans could not have been a limited partner in his individual capacity. *See* Tr. 305:8–11, 435:20–436:6; Pl.'s Mem. at 16–17; Pl.'s Reply at 4. SSN Funding counters that, having elected to convert his Promissory Notes to equity in March 2013, the September Subscription Agreement acted to *renew* Evans' earlier election and combined his investment with Roger Moore's $100,000 investment. Defs.' Mem. at 19. This process is permissible, SSN Funding assures, because it comports with the requirement that Evans make his election by March 2013, which indisputably occurred, and there is nothing in the language of the Promissory Notes that precludes Evans from entering a separate subscription agreement or combining his equity interest with Moore's through the E&M limited liability corporation.

Indeed, the September Subscription Agreement appears to have contemplated just such an arrangement. The first page of the September Subscription Agreement bears the following notation: "NOTE: This subscription agreement encompasses *Moneys already received and acknowledged by SSN Funding and creates no new obligations* for subscriber herein." September Subscription Agreement, Schoenstein Aff., Ex. 9 at 1 (emphasis added). Evans claims that this note is irrelevant because it suggests only that "Evans contributed funds back when he loaned money to SSN's predecessor" through the Promissory Notes. Pl.'s Reply at 5–6. This argument is unavailing for two reasons. First, the notation states that it is *SSN Funding*— not its predecessor—which received the funds. This suggests that the "Moneys" were not loans, but the equity interest that Evans obtained in SSN Funding. Second, and further underscoring this point, the notation's statement that the "Moneys already received and acknowledged . . . creates no new obligation for [the] subscriber" was clearly meant to discharge the additional obligations that Evans would otherwise have undertaken pursuant to the September Subscription

Agreement. That statement only makes sense if you accept that Evans had previously converted

his notes to an equity interest in SSN Funding and undertaken obligations set forth in the

virtually identical March Subscription Agreement. *Compare* March Subscription Agreement

*with* September Subscription Agreement.

In addition, there is nothing that precludes Evans from combining his $250,000 equity

interest with that of Roger Moore's $100,000 investment through E&M. And Evans testified

that he did just that. As Evans explained it, Clark wanted SSN Funding to remain a "minority-

owned business" so that the venture was eligible for additional funding and programming

opportunities. Tr. 108:18–109:4. Although Moore was willing to invest in the enterprise, he was

not a minority. Thus, Clark asked Evans, who is a minority, to combine his equity stake with

Moore's through an LLC so that SSN Funding could continue to claim minority status. Tr.

108:22–109:24. Evans consented to that arrangement and, in May 2013, filled out the necessary

paperwork and "paid to form" E&M. Tr. 109:25–110:14. Consistent with Evans testimony,

McHenry explained that the $250,000 that Evans invested to enter the "original . . . Evans . . .

limited partnership agreement that he signed as a single individual" was "[t]he same $250,000"

invested through E&M. Tr. 435:1–15. McHenry continued: "So we can talk about the sophistry

of this company versus that company. In the end, James Evans whether it is through the [March

Subscription Agreement] or the [September Subscription Agreement], is a limited partner." Tr.

435:16–19. [8]

The Court is persuaded, as SSN Funding argues, *see* Defs.' Reply at 8, that this testimony

---

[8] In his papers, Evans makes much of the fact that Campbell and McHenry confirmed that E&M, and not Evans, was listed on the September Subscription Agreement. Pl.'s Mem. at 10–11 (citing Tr. 305:8–11; 306:6–10; 435:20–436:6. For the reasons set forth above, and as more fully explained by McHenry himself, that fact does not override the ample evidence suggesting that the parties understood that Evans had converted his Promissory Notes to equity.

and the notation on the September Subscription Agreement provide a reasonable basis for the jury to conclude that Evans timely elected to convert his Promissory Notes to equity and then consolidated his previously acquired interest with Moore's through E&M under the September Subscription Agreement. This conclusion is sufficiently supported by Evans' execution of the Subscription Agreements and the LPA, Avent's testimony that he understood Evans became a limited partner upon Avent signing the LPA, and Evans' own stated belief that he operated as an SSN limited partner.[9]  Indeed, McHenry's testimony that prior to the lawsuit Evans never claimed that he was owed money on the Promissory Notes, Tr. 424:22–25, which would have matured and been owing for 19 months prior to the filing of this action, lends credence to the notion that Evans understood he had converted his Promissory Notes into equity, irrespective of whether he or E&M, his wholly controlled LLC, held that interest.

\* \* \*

The jury was charged that under Arkansas law,[10] "[i]f the agreement does not specifically state the manner of acceptance required, a party may assent to be bound in any reasonable manner by any reasonable medium." Tr. 494:6–12. The March Subscription was signed by Evans and, by Evans' own admission, he acted as a limited partner of SSN Funding. Under those circumstances, a jury could reasonably conclude that Evans intended to be bound by the Subscription Agreements. Because there is sufficient evidence supporting the jury's finding of conversion, that finding cannot be disturbed. *Song*, 957 F.2d at 1046 (quoting *Mattivi*, 618 F.2d

---

[9] Without further elaboration, Evans states that the Notes could only be amended "by an agreement in writing signed by the Borrower and Lender." Pl.'s Mem. at 16.  Although it is unclear why Evans invokes that language, as the Court noted in its Summary Judgment Opinion, Evans' conversion of the Notes to equity did not constitute an amendment to the Notes.  Summary Judgment Opinion at *9.

[10] Pursuant to the Subscription Agreements' choice-of-law provision, the Subscription Agreements must be construed in accordance with Arkansas law.  *See* March and September Subscription Agreements ¶ 19.

at 168).

As a consequence of that verdict, Evans is a limited partner of SSN Funding. That fact destroys diversity and divests the Court of subject matter jurisdiction. *See, e.g.*, *Carden v. Arkoma Assocs.*, 494 U.S. 185, 195–96 (1990) (holding that, to determine diversity, a court must look to the citizenship of all members of an "artificial entity"); *Handelsman v. Bedford Vill. Assoc. Ltd. P'ship*, 213 F.3d 48, 51–52 (2d Cir. 2000) (noting that both limited liability companies and limited partnerships take on the citizenship of each of their members for purposes of diversity jurisdiction); *Quantlab Fin., LLC, Quantlab Techs. Ltd. (BVI) v. Tower Research Capital, LLC*, 715 F. Supp. 2d 542, 546–47 (S.D.N.Y. 2010) (same).[11] Accordingly, unless the jury's finding of fraud infects the totality of Evans' equity investment or the Subscription Agreements themselves, the case must be dismissed.

### 2.     Fraud

Evans contends that the jury's finding of fraud with respect to the $100,000 March Note renders the jury's verdict of conversion in connection with the March Subscription Agreement void *ab initio*, thereby unwinding Evans' equity interest in SSN Funding.[12] Pl.'s Mem. at 19–21.

---

[11] There is no dispute that if Evans is found to be a limited partner in SSN Funding that he was a limited partner at the time he filed this action, which is the relevant inquiry for purposes of diversity jurisdiction. *See Reynolds v. Wohl*, 332 F. Supp. 2d 653, 656 (S.D.N.Y. 2004) ("[W]hether federal diversity jurisdiction exists is determined by examining the citizenship of the parties *at the time the action is commenced*.") (emphasis in original).

[12] To be sure, Evans repeatedly asserts in his papers that "fraud . . . permeated the entire transaction." Pl.'s Mem at 4; Pl.'s Reply at 7 (asserting that "any effort to convert Plaintiff's loans to equity was permeated by fraud"); *id.* (asserting that Evans was "duped . . . into making loans with false promises and fake documentation"). But the evidence of fraud that Evans points to concerns only Mercado-Valdez and Clark's false representations regarding the March Note, and he does not identify *any* evidence of fraud in connection with the December Note, or the Subscription Agreements themselves. Specifically, Evans states that "[p]rior to executing the [March] Note, [he] spoke with . . . [Mercado-Valdes] and Clark" and that they "agreed that the $1000,000 invested under the March Note would be placed in an escrow account and would not be utilized for any purpose unless a total of $2,000,000.00 was raised for the Network." Pl.'s Mem at 5. He then notes that in June 2012, "Mercado-Valdes and Clark . . . asked if Evans would authorize the release of the $100,000 from escrow so that SSN [Funding] could purchase an interest in [Gateway]," but, as the evidence bore out at trial, the funds were not actually used for that purpose. Pl.'s Mem at 6. On that basis—and that basis alone—Evans asserts that the jury's finding of fraud with

In response, SSN Funding offers a range of arguments as to why the Court should not find that the March Note was procured by fraud. Neither party, however, addresses the fundamental issue before the Court: whether a finding of fraud with respect to the March Note can render the Subscription Agreements void *ab initio*, when there was no finding of fraud as to the December Note or the Subscription Agreements themselves. The answer is quite obviously no.

Under New York law,[13] to prove a fraudulent inducement claim a plaintiff must show that they "reasonably relied upon the representation" and "as a result of such reliance . . . suffered damage." *Kriegel v. Donelli*, No. 11 CIV. 9160 (ER), 2014 WL 2936000, at *10 (S.D.N.Y. June 30, 2014) (citing *Universal Antiques, Inc. v. Vareika*, 826 F. Supp. 2d 595, 607 (S.D.N.Y. 2011); *GoSmile, Inc. v. Levine*, 81 A.D.3d 77, 81, 915 N.Y.S. 2d 521 (App. Div. 1st Dep't 2010)). Even assuming that the jury's finding that the March Note was procured by fraud (and is therefore void *ab initio*) stands, the jury was not asked to make a finding of fraud with respect to the December Note or the Subscription Agreements. And a finding of fraud with respect to the March Note, *i.e.*, that the proceeds of that Note were not held in escrow or used to purchase an interest in Gateway, does not support a finding that Evans was fraudulently induced to enter the other agreements, or relied on the early misrepresentations in doing so. As a result, those agreements were left intact by the jury's verdict and Evans continues to hold, at a minimum, a $150,000 equity interest in SSN Funding. Accordingly, SSN Funding takes on the citizenship of Evans, destroying diversity and divesting the Court of subject matter jurisdiction.

---

respect to the March Note voids *ab initio* any Subscription Agreements that were entered into approximately a year (or more) later. *Id.*; Pl.' Reply at 8.

[13] New York law governs the March Note. March Note ¶ 11 ("This Note shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York, without regard to principles of conflicts of law.).

The case must therefore be dismissed.[14]

## IV. CONCLUSION

For the reasons set forth above, both parties' motions for judgment as a matter of law are DENIED and the case is dismissed for lack of subject matter jurisdiction. The Clerk of Court is respectfully directed to terminate the motion, Doc. 99, and close the case.

SO ORDERED.

Dated:    August 20, 2018
          New York, New York

Edgardo Ramos, U.S.D.J.

---

[14] In view of the Court's conclusion that the jury's verdict is supported by sufficient evidence, Evans' Rule 59(a) motion for a new trial is likewise denied. *See Manley*, 337 F.3d at 244–45 (2d Cir. 2003) (stating that "for a district court to order a new trial under Rule 59(a), it must conclude that the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice, *i.e.*, it must view the jury's verdict as against the weight of the evidence.") (quoting *DLC Mgmt. Corp.*, 163 F.3d at 133–34 (2d Cir. 1998)) (quotation marks omitted).